IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARCELLUS FRENCH, B03076, ) ) ) Plaintiff, ) ) vs. ) ) ANTHONY WILLS, ) SAMUEL STERRETT, ) ) Defendants. ) | Case No. 25-cv-1599-DWD |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Marcellus French, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Menard Correctional Center (Menard), brings this civil rights action for alleged deprivations of his constitutional rights under 42 U.S.C. § 1983 and RLUIPA. On October 15, 2024, the Court designated three claims sufficient to proceed beyond initial review concerning Plaintiff French's ability to observe his religion by attending regular Taleem and Jumu'ah services at the prison (Doc. 4). On June 10, 2025, Plaintiff French filed a motion for a preliminary injunction (Doc. 6) wherein he alleged that since the filing of this lawsuit, he has not been allowed to attend a single religious service. On August 4, 2025, Defendants responded. (Doc. 11). On September 4, 2025, and November 18, 2025, the Court held evidentiary hearings concerning the request for preliminary injunctive relief. The Court now finds it appropriate to grant preliminary injunctive relief as further detailed in this Order.

## Background

The operative claims from the Complaint are:

**Claim 1:** First Amendment claim related to the denial of Jumu'ah and/or Taleem services against Defendants Sterrett and Wills in their individual capacities (or against Defendant Wills in his official capacity for any injunctive relief sought);

**Claim 2:** RLUIPA claim related to the denial of Jumu'ah and/or Taleem services against Defendant Wills in his official capacity;

**Claim 3:** Equal Protection claim related to the denial of Jumu'ah and/or Taleem services for inmates in the East cellhouse against Defendants Sterrett and Wills;

In the motion for a preliminary injunction, Plaintiff stated that defendants have acted in concert to deny him access to any and all Al-Islam services (Taleem and Jumu'ah). (Doc. 6 at 1-2).

In response, the Defendants filed a brief, supported by a declaration from Chaplain Samuel Sterrett. (Docs. 11, 12). The Chaplain explained that Taleem is offered once a week, and Jumu'ah is offered the second Friday of the month at 1:15p.m.. (Doc. 12-1 at ¶¶ 13-14). Due to staffing shortages, only 9 inmates are allowed to attend chapel per week, and those in attendance are to be rotated. (Doc. 12-1 at ¶¶ 19-20). Chapel lines may be cancelled due to availability of staff, time and space; the need to share space with all groups; institutional safety and security; and, conflicts with other scheduled activities. (Doc. 12-1 at 23-24).

The Court determined that the preliminary injunction could not be resolved on paper because restrictions on religious activity cannot be justified by overly generic security concerns. (Doc. 13). Thus, the matter was set for an evidentiary hearing.

### The Hearings

The testimony presented at the September 4, 2025, hearing is fully recounted in the Court's earlier Order granting interim injunctive relief. (Doc. 21). In short, Plaintiff credibly testified that he was not being afforded any opportunity to attend religious services, despite other inmates from his housing unit being allowed to attend services. Plaintiff credibly explained that Taleem and Jumu'ah attendance are important to his religious practice. Although the Court indicated in the written order setting the preliminary injunction for a hearing that the Defendants would need to present more than a generic security-based reason for the restrictions on service attendance, the Defendants did not present any additional evidence or testimony at the hearing. Counsel attempted to contact Chaplain Sterrett during a short pause in the proceedings to see if he was available to testify, but this query was unsuccessful. Ultimately, the Court agreed to defer a final ruling on the preliminary injunction until it could conduct a second hearing, so that Defendants could gather appropriate responsive evidence. In the interim, the Court directed that Plaintiff be taken to the services offered each week, and it specified that his attendance should not displace other inmates who may also wish to attend.

On November 18, 2025, the Court conducted the second evidentiary hearing. Defendants presented Chaplain Samuel Sterrett, who was able to describe religious

offerings at Menard, and the process for inmates to seek participation in services. Sterrett testified that an inmate must send a kite or written request to the chaplaincy department asking to be placed on a religious call line for services. Once an inmate is approved and added to a call line for his cellhouse, he will then be in the rotation to be called to the services that correspond with his religious affiliation. Religious affiliations are split into two large groups: the "all faiths" line includes denominations such as Catholic, Jewish, Islam, Druids, Pagans, etc., and the other line includes Protestants and Christians. The all faith line is conducted in the morning, and the Protestant/Christian line is conducted in the afternoon. The East House all faiths chapel line is run on Tuesday mornings and includes Islamic inmates who wish to attend a Taleem gathering, and Islamic Jumu'ah service is offered once a month on the second Friday in the afternoon.

Sterrett is responsible for generating a call line list that is distributed to officials in each housing unit so that inmates may be gathered and escorted to the chapel at the times designated for their religious observance. Only nine individuals are allowed to attend chapel at a given time. Sterrett makes a list of the nine individuals by reviewing those who are assigned to the religious call line for a housing unit. If there are more than nine individuals, he rotates through the list on an equal basis. If he notices when preparing the list that someone has moved to a different housing unit, then he will remove them from the rotation. He will not automatically add them to the call line for their new housing area, and he will not re-add them to the call line if they return to the original housing location. It is an inmate's responsibility to send a new kite asking to be added to the line each time his housing placement changes. At the time of the hearing, Sterrett

indicated that he believed there were about seven individuals from the East house on the all faiths chapel line, and 4 on the afternoon Christian/Protestant line.

Sterrett distributes chapel line lists to the housing units via email, and he also delivers physical print outs to the East and West houses. Although he prepares the chapel line lists for the appropriate days, Sterrett has no control over whether services are conducted or cancelled. He testified that services are often cancelled due to safety and security reasons, such as staff shortages. He is not notified on any given day that a cancellation will occur and has no control over cancellations. Sterrett could not provide testimony about specific reasons for the cancellations.

Inmate assignments to chapel lines are tracked via the Offender360 system. Sterrett reviewed recent logs and testified that Plaintiff had chapel line assignments for Jumu'ah and Taleem from May 15 to July 7, 2024. The assignment was terminated because Plaintiff was in disciplinary confinement, and it was not re-initiated upon his release. Plaintiff again received chapel line assignments as a result of the Court's Order following the September 4, 2025, evidentiary hearing. Sterrett testified that since Plaintiff was assigned to chapel line in early September, no chapel lines have been run for the East house.

On cross-examination by the Plaintiff, Sterrett testified that he was not aware of any chapel line being run on September 16, 2025, in the morning. He also testified that on November 14, 2025, a Christian Kairos service was conducted on a Thursday and Friday from 8am-2pm. The program is largely run by volunteers, but there is a security officer present in the chapel and in a watch tower. He explained that this is a program

provided by an outside organization once or twice a year, and that those who observe religions other than Christianity are welcome to attend. In fact, he testified that there were some Islamic followers from the West house who participated in the Kairos program in November. Sterrett also testified that if an Islamic organization wished to volunteer to provide such a service, it would be welcome if approved.

When asked why Plaintiff did not attend any chapel services from December of 2022 through April of 2023, Sterrett indicated that it was perhaps due to Covid restrictions on movement. When asked why Plaintiff did not attend any chapel services from September of 2023 through May of 2024, Sterrett generically indicated "it would have been a safety, security and administrative reason." He agreed that during this September of 2023-May of 2024 period, Plaintiff had an active chapel line assignment. As for the period of October 2024-November 2025, Sterrett testified that Plaintiff was not called to chapel during this time because he did not have an active chapel assignment until one was created in response to the Court's September order.

## Analysis

To seek a preliminary injunction, a plaintiff must establish: a likelihood of success on the merits of his claim; no adequate remedy at law; and, irreparable harm without the injunctive relief. See *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). As for the first requirement, the Court must determine whether "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). "A movant's likelihood of success on the merits must be strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020). While

Plaintiff is not required to "show that [he] definitely will win the case…a mere possibility of success is not enough," and he must make "[a] strong showing that [he] is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). A strong showing typically entails a demonstration of how the applicant intends to prove key elements of his case. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020); *Doe v. University of Southern Indiana*, 43 F.4th 784, 791-92 (7th Cir. 2022) (the court is not required to make inferences in the movant's favor when considering preliminary injunctive relief).

The Court must also decide whether an adequate remedy at law exists and whether the plaintiff will suffer irreparable harm without injunctive relief. Irreparable harm is harm which cannot be repaired. *Graham v. Med. Mut. Of Ohio*, 130 F.3d 293, 296 (7th Cir. 1998) ("Irreparable harm is harm which cannot be repaired, retrieved, put down again, atoned for. The injury must be of a particular nature, so that compensation in money cannot atone for it."). The Court must then weigh "the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest." *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665.

An injunction that seeks an affirmative act by the respondent is a mandatory preliminary injunction and should be sparingly issued. *Mays*, 974 F.3d at 818. If injunctive relief is warranted, the Prison Litigation Reform Act provides that the

injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

In this case, Plaintiff's claims rely on the First and Fourteenth Amendments, and RLUIPA. Because RLUIPA generally provides the broadest protections for religious exercise in prison, the preliminary injunction analysis is focused on RLUIPA. *See* Grayson v. Schuler, 666 F.3d 450, 451 (7th Cir. 2012) (RLUIPA offers broader protections than the First Amendment). There is a burden-shifting framework for RLUIPA claims. Specifically, "[i]n establishing a claim under RLUIPA, the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion." *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). If "the plaintiff establishes this prima facie case," the defendant must demonstrate that its "practice is the least restrictive means of furthering a compelling governmental interest" to defeat the plaintiff's claim. *Id.* The burden of persuasion lies fully with the prison to establish a compelling justification for a restriction and to demonstrate it is the least restrictive means to accomplish a goal. *See Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015). Generic security concerns do not suffice. *Id.* (finding that concerns about food safety, or gang affiliations were not enough to justify restrictions on a religious diet or bandana because they were not linked to the inmate's personal situation and his requested accommodations); *Holt v. Hobbs*, 574 U.S. 352, 369 (2015) ("Courts must hold prisons to their statutory burden, and the must not 'assume a plausible, less restrictive alternative would be ineffective.'").

After the September hearing, the Court concluded that Plaintiff had met his prima facie burden to show that he seeks to exercise his religion and that his religious exercise was being substantially burdened by his total inability to attend services. The Court also concluded that the Defendants had failed to supply any evidence to meet their burden of establishing a compelling justification for the restriction on Plaintiff's religious exercise. Following the November hearing, the Defendants fare no better. Defendants still have not provided any justification for the limitations on religious services beyond the generic, "safety, security, and administrative reasons." As the Court previously explained in the original written order setting the preliminary injunction for a hearing (Doc. 13), and in the September Order granting interim injunctive relief (Doc. 21), a generic security concern is not sufficient for the Defendants to meet their burden. *See e.g.*, *Ramirez v. Collier*, 595 U.S. 411, 427 (2022) ("Under RLUIPA, the government cannot discharge this burden by pointing to 'broadly formulated interests.'") *citing Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014).

The level of scrutiny required of the justifications provided by the prison for a particular restriction is exacting. For example, in *Ramirez v. Collier*, the Supreme Court considered various justifications that Texas prison officials offered for restrictions on religious exercise in the prison execution chamber. Specifically, they considered if an inmate should be afforded audible prayer from a spiritual advisor, and if the advisor should be allowed to lay a hand on the inmate during the execution. The prison argued that the prayer could interfere with their ability to monitor an inmate's condition during the execution via an overhead microphone and it could allow for the advisor to make an

inappropriate or exploitive statement. The Court indicated that although both issues may relate to compelling interests, the prison did not adequately link these conclusory concerns to the particular inmate and spiritual advisor at issue. As to the religious touch, the prison argued that it would hinder security in the execution chamber, it could cause unnecessary suffering, and it could add to the emotional trauma for victim's family members. The Court considered each concern as legitimate but concluded that none were supported by a sufficient showing that the ban on all touch was the least restrictive means to accomplish the stated goal. For example, theoretically an advisor could interfere with the IV line during an execution, but the Court reasoned the advisor could instead be positioned to touch a lower extremity in such a way medical staff had full view of the IV line. The Court emphasized that "[o]nce a plaintiff has made out his initial case under RLUIPA, it is the government that must show its policy 'is the least restrictive means of furthering [a] compelling governmental interest." *Ramirez*, 595 U.S. at 432.

In *Schlemm v. Wall*, the Seventh Circuit considered a prison's insistence that it could not serve game meats as requested by an inmate for religious celebrations based on purported food safety concerns, and concerns that making this accommodation for one inmate could open a costly floodgate of individual requests. 784 F.3d 362 (7th Cir. 2015). The Court noted that while food safety could perhaps be a compelling justification, the prison failed to demonstrate that no USDA-inspected meats were available or that they were unsafe. The *Schlemm* Court characterized the lack of specific evidence as a failure on the burdens of production and persuasion, particularly where venison is widely sold in supermarkets and restaurants. The Court also rejected the floodgates

concerns, reasoning that the prison did not show it would be costly to accommodate the plaintiff's need, and concerns of future costs for other inmates should be deferred for later litigation. In *Schlemm*, the Court also considered and rejected the generic argument that the inmate could not wear a religious bandana for gang affiliation reasons where the plaintiff was amenable to wearing a bandana not associated with gang colors and limiting the areas of the prison where he wore it. Ultimately, the *Schlemm* Court overturned summary judgment for the prison and directed that the plaintiff be given preliminary injunctive relief in the form of venison for his celebration and the ability to wear his bandana until the final resolution of the litigation. Likewise in *Knowles v. Pfister*, the Seventh Circuit rejected generic gang affiliation and security concerns about an inmate who wanted to wear a metal wiccan medallion underneath his clothing, and it directed preliminary injunctive relief allowing the medallion. 829 F.3d 516 (7th Cir. 2016).

In the present case, the Defendants have not met their burden to identify a compelling government interest, and to demonstrate that their actions are the least restrictive means of furthering that interest. They generically cite to prison security, staffing, and administration, but Sterrett was unable to explain in any detail how these concerns manifest on a daily basis, or why the repeated cancellation of services for months on end is the least restrictive means to deal with these issues. Security is always considered an important interest in the prison environment, and one to which courts pay great deference, but Defendants, despite being given ample opportunity, offered no specific reason why prison security would be jeopardized by running religious services a few times a week for a dozen or less inmates. Nor did Defendants offer a focused

explanation for the reason Plaintiff was not permitted to attend religious services since the entry of this Court's September Order.

The Court also understands that staffing can be a challenge, but a perennial lack of staff cannot become a basis to deprioritize or eliminate all opportunities for religious observance. Even the Defendant's reference to the rather amorphous notion of a staffing crisis appears weak given that the typical religious services for the call lines only last for an hour one day a week for the East house and the second Friday each month, but in November an outside religious organization ran the Kairos program for two consecutive days from 8am to 2pm, supervised by two prison security personnel. This suggests that the prison does have staff that can be made available for religious gatherings and it chooses to forgo its legal obligation for some unarticulated reason. Sterrett also testified that the chaplaincy department is understaffed, but he indicated that when call lines are run he does not play any active role whatsoever and is merely present in his office. This suggests that the lack of chaplaincy staff is not a reason to cancel services. If there truly is a staffing crisis at Menard that is significantly impairing the operation of typical functions like routine religious services, it was the obligation of Menard to present some evidence about the scope and duration of the shortage, and the programs that do versus do not get to proceed under the shortage, before it could even begin to fairly assess if cancelling services was the least restrictive option available to deal with the staffing issue.

In addition to security and staffing, Sterrett repeatedly stated that administration may be the cause of cancellations, but it is not clear what this refers to apart from administrators making security or staffing decisions about which services will be offered.

On the whole, the Defendants' proffered evidence is substantially short of meeting the burdens of production and persuasion that they carry once Plaintiff has established his prima facie case of a RLUIPA violation. This is particularly troubling where the Court afforded the Defendants a second evidentiary hearing to set forth evidence of this nature. Given the paucity of evidence about the reasons for repeatedly cancelling religious services, the Court remains convinced that Plaintiff has demonstrated a great enough likelihood of success on his claims to warrant ongoing injunctive relief for the duration of this litigation.

The Court must also consider the likelihood of irreparable harm, and it must balance the burden of providing the directed relief and the public interests. The issuance of injunctive relief is appropriate in this case because Plaintiff will suffer irreparable harm during this litigation if he is unable for months or even years to attend any weekly religious services. *See e.g.*, *Felton v. Commissioner of Indiana Dept. of Corr.*, 2021 WL 1090256 at * 2 (S.D. Ind. Mar. 22, 2021) (finding that an inmate who complained about complete denial of Druid group worship opportunities identified irreparable harm that lacked an adequate remedy at law, and granting preliminary injunctive relief intended to facilitate group worship). Additionally, the burden on Defendants to provide the services appears to be relatively light. The services for Plaintiff's cellhouse happen each Tuesday, and on the second Friday of the month, with each service lasting only an hour. By Sterrett's description of things, he already does all of the work to indicate to cellhouse staff who should be attending, and the number of individuals who desire to attend services from the East house is relatively small (about 7 attendees for the all faiths line). It is not

apparent how holding an hour-long service once a week for roughly 7 individuals who are already identified, and for whom call passes are already routinely provided, would be an extreme burden on the prison. The Court finds that the directive to afford Plaintiff weekly opportunities to observe his religion is not an extreme burden on the prison and will not harm public interests of any sort.

Finally, it is worth noting that in September when the Court issued the first order setting out short-term injunctive relief, it specifically directed that the contents of the Order be communicated to the Warden of Menard. Warden Wills is a defendant in this case in his official and individual capacity, and as Warden of Menard, he is expected to implement Court-ordered injunctive relief. At the November 18 hearing, the Court was dismayed to learn that Plaintiff had not been permitted to attend a single religious service since September, and that counsel had no knowledge if the September Order had been relayed to Warden Wills. These lapses are inexcusable. With the issuance of this Order, the Court expects that Warden Wills/Menard will ensure that Plaintiff's right to access regular religious services is appropriately respected and protected.

The prison shall continue to implement the previously directed relief as follows:

- The prison shall arrange for Plaintiff to attend the weekly Tuesday morning Taleem Islamic service for his cellhouse, and he shall count as the 10th attendee for the all faith line such that he does not displace another inmate from the 9-available slots for weekly observance of his religion. Given Sterrett's testimony, it seems that the all faith line in the East House

      is under the 9-person capacity as is, so this order should not work any great disruption on the ability of others to attend services.

- The prison shall also arrange for Plaintiff to attend the once-a-month Friday afternoon Jumu'ah gathering, which is to be held the second Friday of the month at 1:15p.m. for his portion of the East cellhouse. Again, Plaintiff shall be the 10th attendee and thus shall not displace others.

### DISPOSITION

The Motions for Leave to File (Docs. 19, 24) are **GRANTED**. Each party filed exhibits that were supportive of or were referenced during their testimony on the preliminary injunction.

Plaintiff's Motion for a Preliminary Injunction (Doc. 6) is **GRANTED**. **IT IS HEREBY ORDERED THAT:**

- The prison shall arrange for Plaintiff to attend the weekly Tuesday morning Taleem Islamic service for his cellhouse, and he shall count as the 10th attendee such that he does not displace another inmate from the 9-available slots for weekly observance of his religion.

- The prison shall also arrange for Plaintiff to attend the once-a-month Friday afternoon Jumu'ah gathering, which is to be held the second Friday of the month at 1:15p.m. for his portion of the East cellhouse. Again, Plaintiff shall be the 10th attendee and thus shall not displace others.

This Order shall remain in force for the duration of this litigation.

The Clerk of Court shall transmit a copy of this Order to the Litigation Coordinator at Menard Correctional Center to be shared with Warden Anthony Wills for immediate implementation of the relief set forth.

**IT IS SO ORDERED.**

Dated: December 7, 2025

_____
DAVID W. DUGAN
United States District Judge
